May it please the court, this is a case based on speculation. The government offered no direct evidence that Rhonda Liddle sat down with anyone and agreed to a plan to defraud the credit union or to take money from the credit union and spend it on personal items. And it generated no evidence in that regard. Secondly, and the second element that I'm talking about today, is the jury instructions. Those were confusing to say the least and in many respects misled the jury as a whole. Indeed, while inconsistent verdicts may stand, there are in fact inconsistent verdicts in this case. That is to say, the jury convicted on some counts and acquitted on other counts. But how is that inconsistent? Doesn't that reflect that the jury just looked at the evidence and determined whether or not some evidence supported conviction on counts and there was insufficient evidence for other counts? Why would that be inconsistent? Well, one of the areas where it comes up first is in the issue of the Toyota Sequoia. That's the personal vehicle. There was a check for the amount of $39,000.120 that came through from Frank Rulis to Ms. Liddle. And with respect to that, the jury found that she was not guilty on that in terms of credit institution fraud, count 42, yet the jury convicted on money laundering in count 63. But how is that inconsistent? I mean, you can be convicted of money laundering knowing that you are in possession of the proceeds of illicit activities and that by engaging in whatever the financial transaction is that you're actually helping the person who took the money launder the proceeds. That's not an inconsistent verdict. Well, I guess the problem for me in your attack on the sufficiency of the evidence, to go back to the point you opened with, is this is not sort of your typical innocent spouse that signs off on the tax return having no idea what her husband or significant other put into the return. She received on multiple occasions substantial sums of money over a period of quite some time and then engaged in obstructive activities during the FBI investigation in order to thwart the agents who were trying to interview the witnesses. This does not strike me as being someone who was peripherally involved. All right. I would beg to differ with the court. And let me attack first that issue regarding obstructive conduct, because that would tend to show her knowledge of guilt and things of that sort. The prosecution overplays its hand on this when it says that she backdated the note. There's no indication about who prepared a promissory note. But she delivered the note. She delivered the note. And the purpose of backdating the note was to try to convince the investigators that this was a legitimate loan, when in fact the government argued, apparently the jury believed, that it was not. She delivered the note. But there's no evidence that shows that she saw the note, she note, other than the fact that she signed it. I mean, it does not indicate that she, for example, on the other one that has to do with the defenses that her husband wrote out. The talking points. Yeah, the talking points. There's no indication that she saw that. She delivered it. But that was the same thing, if you will, that was Why couldn't the jury infer from the fact, first of all, with regard to the note, she signed it, so isn't it a proper inference for the jury to draw that she actually read it before she signed it? I mean, what more could the government prove in that regard? That is an inference the jury could draw with respect to the note. And we have to view the evidence in the light most favorable to sustain the verdict, do we not? You do. So we would have to conclude then that that was a proper inference that a reasonable juror could draw from that piece of evidence. You have to, you are required under the case law to draw inferences in favor of supporting the jury verdict in your first step or your first pass under the Jackson analysis as outlined in Neville's. Right. On the second pass, you can take into account other evidence that suggests she didn't know. She wasn't as smart as you suggest she was. Didn't she keep the finances for the family? She paid the bills. And she clearly had to have known based on her husband's salary that without these big wads of cash that were coming to her on a regular basis, her husband wasn't making enough money to pay all the expenses for the checks that she had to write. Okay. And that may be a fair point with respect to money laundering because all you have to show is that it's criminal proceeds. But the question becomes when you talk about that money that she got, she got more money than he made. And my question would be, and what does that show? Does that show she knows that he is falsifying the books of the credit union? I think your defense was that they'd amassed $300,000 in Japan or something and that that was actually money that he had loaned to these people. And so these cash payments and envelopes were simply payments on the loan. Wasn't that the defense theory? I believe that was Mr. Little's defense. And he was the one who spoke about it. He testified. And apparently the jury didn't buy that. No. So then my question for you is, where did Ms. Little think this money was coming from if it wasn't somehow related to these loans that her husband was making to the people who were delivering the cash to her? These were family friends. These people, Ruiz and Thielen, were delivery boys, if you will. They delivered money to her. And as Thielen testified and said, I gave it to her. There was really not much discussion. It was simply. You know, if it was one time, I'd be with you, Mr. Drake. But, I mean, we're talking about multiple deliveries. I mean, this is just so odd that people would come by periodically with big wads of cash and say, here, Ms. Little. Or maybe they didn't say anything. Maybe they just handed her the envelope. And then she immediately went down to the bank and deposited it in her checking account so she could pay the family bills. I don't know. But what else did the jury have before it to explain an innocent explanation that would benefit Ms. Little as to where this money was coming from? Well, the. You have. Government's theory was it was kickback from the loans. And they had lots of evidence of that. They had, I assume, testimony from at least one of the individuals. They had testimony from Ruiz and from Thielen that they had agreed with Mr. Little to do certain things. That he was going to ask them to sign a loan and they were going to give him some money. And they testified unequivocally that all those discussions took place between themselves and Mr. Little. But Ms. Little was not involved. Ms. Little went down to the bank when it came time to buy the house and got the $500,000 check in order to close on the purchase of the house, didn't she? Yes, she did. Where did she think that money was coming from? That is something that I don't have to explain but the government has to offer. But the government did offer an explanation. And I guess where you and I are having a difficult time in evaluating the evidence is your challenge as to the sufficiency of that evidence. Could a reasonable jury in the face of all this very suspicious behavior by all these individuals and her very active involvement in handling the financial affairs for the family, draw the inference that she knew darn well where the money was coming from? I don't see any other source from which the jury could have thought that the money came. And therefore, your client must have known. The problem is we can't get into her head. The only thing she said to the FBI when they came to see her was you're asking me basically to sell out my husband at 25 years. I'm not going to do that. Okay, fair enough. Let me ask a little question about the instructions and the concern about the Juul instruction. First of all, it does appear that in the Ninth Circuit there has been approval of a Juul deliberate ignorance instruction in conspiracy cases by a panel that included Judge Rawlinson, for example. But even assuming that that was wrong, a contention here is that at least as to some counts, the deliberate ignorance was used to get the conspiracy conviction, which was allegedly wrong. And then Pinkerton was used to get substantive convictions by virtue of the conspiracy. But didn't the jury reject some of the contentions by the government for conviction on counts that would have been within Pinkerton? Absolutely. So doesn't that tend to indicate that the jury wasn't applying Pinkerton but was applying, let us say, the direct approach to guilt? Because if it was applying Pinkerton, they would have convicted on all those counts. Yes, every count. And that cleans up a lot of the issues, doesn't it? There's no improper use of a conspiracy conviction even if there was an improper conspiracy conviction. The issue is tangled up somewhat, and I do want to save some time for rebuttal. But the issue is tangled up somewhat in the sense that the deliberate ignorance instruction spoke with respect to criminal proceeds. It didn't talk about criminal proceeds from the financial institution, from a crime to defraud the financial institution. And so to that extent, it mirrored, if you will, the language that Judge Tallman would point out in the money laundering. But it did not compare with the elements required for the conspiracy or for the financial institution fraud, which required that she knew he was defrauding his employer, the credit union, by deceiving them. Do you want to save the rest of your time for rebuttal? Yes. Okay, very well. Let's hear from Ms. Lambert. Thank you. May it please the Court, my name is Monica Clapper, and I represent the United States in this matter. This Court is absolutely correct. This is not a situation where an innocent spouse was wrongly convicted because she spent the proceeds of the crimes that her husband separately engaged in. This case is very far from that. So why did you ask for a Juul instruction? I mean, it seemed to me there's more than ample evidence to establish conspiracy, and I think it was perfectly appropriate to instruct on a Pinkerton theory. But why did you need the Juul instruction? Well, the Juul instruction, interestingly, as it turns out, we did need it because the heart of Rhonda Little's defense was that she was an innocent housewife, very busy with the ministerial tasks of raising two children, and completely relied on her husband and had always relied on him to bring in the money. And so she paid no attention to where the money was coming from. She was very busy doing these other things. You heard my colloquy with Mr. Drake. I mean, this is not what I would call a typical innocent spouse situation. You know, I just signed the tax return, and I don't know how that was prepared. Absolutely not. I mean, she's actively involved here. She absolutely is. And that instruction, of course, is just an alternative to the knowledge mens rea. And we had the typical instruction on what is required for actual knowledge. But the problem is that the district court didn't, and I have very high regard for Judge Bolton as a trial judge, but the district court did not limit the application of the Juul instruction to those counts of the indictment where it might have been most appropriately focused. I can't tell from the way these instructions are written, you know, whether the jury applied a Pinkerton theory of liability or a Juul theory of liability in trying to determine her mens rea. Well, based on the wording of the deliberate ignorance instruction, which is in the record at document 263, page 25, the wording applies to the mens rea of knowingly. Knowingly surfaces again in the instructions as part of aiding and abetting. I'm sorry, you said 25. Yes, at handwritten page 25 in document 263. You may also find that the defendant, Rhonda Little, acted knowingly if you find beyond a reasonable doubt that. And this instruction was given with the series of instructions going to the mens rea of knowingly. It's an alternative finding, alternative means of finding the mens rea of knowingly. It won't apply to an intentionally or willfully or any other type of mens rea. And this jury in particular, as Judge Garvis pointed out, was meticulous in going through each count separately and weighing the evidence, the mental state, the participation, or on rare occasion the lack of participation by Rhonda Little. So there is no reason to presume that this jury did anything other than apply the instructions as written by their plain language. What's your response to Mr. Drake's argument with regard to the Toyota Sequoia? Was that the SUV that she drove? Yes, that was the SUV that she drove. And what happens? So they acquitted her of the institution fraud but convicted her of the money laundering? They acquitted her of something very different from institution fraud. They acquitted her, I believe, of the wire fraud related to that. Were you the trial counsel in this case? Yes, I was one of them. And it is, you know, the elements, of course, for money laundering are very different than either the Federal credit institution fraud or the wire fraud. And as I understand the cover, there was no, I should have asked Mr. Drake, but there was no defense objection to the wording of either the Jewell or the Pinkerton instructions. So we're reviewing for plain error? I can ask him on rebuttal, but I would like an answer, Mr. Drake, when you get back up to that question. No, to be fair, there were, there was an objection to the giving of the, not to the wording of either instruction. The wording itself was correct. It was just giving the instructions at all. Just giving the instructions as a whole, particularly to the whole line of conspiracy instructions. Pinkerton, most particularly because of acclaimed minimal participation, which the judge quickly rejected. One other point that I'd like to make, this Court was reviewing some of the evidence against Rhonda Little. And one piece of evidence that I did point out in the answering brief, but did not point out, was the document that she participated in signing, the kind of fictitious lease agreement that would make her and Bill Little's, you know, residing in the home that was purchased by Frank Ruiz with AEA funds appear to be legitimate. She did sign that in October of 2007 with Bill Little, made representations in that document, and none of those representations were kept. The main one being, of course, that they would pay rent to Frank Ruiz monthly. And that was paid once or twice over the course of 19 months, and otherwise they lived there rent free. So that is another example of kind of perpetuating and concealing the fraudulent activity, which represents, goes to both her knowledge, the mens rea and the active participation in the offense. This is a million-dollar home in Yuma, Arizona? About $600,000. In Yuma, Arizona? Yes. Yeah. The testimony was from Dan Phelan and Frank Ruiz that it was a very, very nice home, even prior to the $100,000-plus remodel. And does the Court have any further questions? If there are no further questions for me, shall I address anything else? Ms. Garvin? No. I don't think so. Okay. Thank you very much. Okay. Mr. Gray? Thank you, Your Honor. Let me correct something that I think was a misstatement, unintentional by Ms. Clapper. Okay. And that is that Rhonda Little was acquitted of wire fraud. There were, I believe, three wire fraud accounts. I think that's what she said. Pardon? That's what she said. Yeah. She was acquitted of those, but she was also acquitted of Count 42, which involves $39,120 cash for the purchase of a 2007 Toyota. She was acquitted of 42 and convicted of 63, which is transactional money laundering regarding that transaction. But that's back to the colloquy that you and I had before. Right. So that's not necessarily an inconsistent verdict. It's curious. One would think that because it was her car, she might have had more of an interest in where the money came from. Right. All I can make out of the jury's circumstances and the verdicts that they rendered is that it's curious. They acquitted her on the first 11 counts of financial institution fraud, which cover a period from May of 2007 to November of 2007. And one can postulate about what that might mean. But they also acquitted her. One postulate, I suppose, would be that the jury figured after the 11th count that she knew. She's probably in this. But then they acquitted her. How did that coincide with the delivery of the? Then they acquitted her of count 40, which is a financial institution fraud, in June of 2009. So it's a curious mix. And that's all that can be said about it. I think it evidences the fact that there was some confusion in the jury room, that we're having a difficult time trying to explain it. I mean, jury compromises are, as you know, not unheard of. And there's nothing we can do about it. But I will bring you back to this issue about the jury instructions and the proof as it pertained to the conspiracy and as to the financial institution fraud. We don't have to guess about the objects of the conspiracy in this case. They're set forth clearly in the indictment. On page 13 of the indictment, in the excerpt of record, my excerpt of record, volume 3, page 476, they list to obtain unreasonably and unjustified business loans, to obtain funds under the guise of loan draws from businesses, to create and use various corporate entities. Those are all the jury, the objects of the conspiracy. And what we end up with is, well, gee, she must have known that it had something to do with her husband's job. Well, I mean, I thought the government's theory was kickbacks on all those loans, that that's where the money was coming from. And that at some point, apparently, the jury thought she had figured out where the money was coming from. And if you look at Castaneda, which is another innocent spouse case, she actually repeated verbatim what her husband told her at one point regarding a drug transaction. And she not only did that, she told other people about what was going on with respect to things. Did she engage in obstructive behavior after the investigation started? Because, frankly, when I was doing these kinds of cases as a white-collar criminal defense lawyer, I cringed when I found out that my client had engaged in this sort of thing after the investigation started. That was always harder to try and explain. Indeed it is, Your Honor. I sympathize with you, Counsel. I really do. I don't recall anything from Castaneda that indicated obstructive behavior. But, again, I would challenge here the concept regarding obstructive behavior. She was a messenger. One last bunmo. If Judge Tallman gives me the opportunity to reminisce as a white-collar criminal defense lawyer, the word is, client, don't walk across that wet cement. That's good. Is that a Baltimore expression? Very good advice. Wet cement goes everywhere. That's right. Thank you both. The case just argued is submitted.
judges: Garbis, Tallman, Rawlinson